E. D. TYLER AND ED SMITH v. MARY HOWELL, M. F. TABORN AND W. L. BARKER.

(Filed 27 October, 1926.)

1. Fraternal Orders—Supreme Lodge—Constitution and By-Laws—Evidence—Injunction.

Where a local or benevolent fraternal order exists under a charter granted by the supreme council, and for years the local order has become inactive on account of failing interest and membership, with its meetings discontinued, and the question of an injunction against the sale of its property by a few of its members claiming to be in financial standing is resisted by the plaintiffs, also claiming to be in good financial standing, the sole question being as to whether a written notice was required under the constitution and by-laws of the supreme lodge: *Held,* an authenticated copy of the constitution and by-laws of the supreme lodge, under the existing circumstances may be introduced in evidence, showing that a previous written notice was required, and make a prima facie case thereof.

2. Same—Injunction.

Where a local fraternal and benevolent lodge has existed under the constitution and by-laws of the supreme lodge requiring written notice to be given to its members before suspension as a financial member, etc., for nonpayment of dues, etc., and such notice has not been given accordingly: *Held,* a resolution passed at a meeting of the local lodge authorizing a sale and conveyance of its property by trustees, C. S., 6536, without complying with this requirement, is invalid, and at the suit of such wrongfully suspended members, an injunction will lie.

APPEAL by defendants from *Devin, J.,* and a jury, at February Term, 1926, of GRANVILLE. No error.

Necessary facts stated in the opinion.

*T. Lanier and Hicks & ·Stem for plaintiffs.*
*A. W. Graham & Son for defendants.*

CLARKSON, J. This action was brought by plaintiffs against defendants to restrain and enjoin the defendants from selling certain real estate on Penn Avenue, in the town of Oxford, N. C., belonging to

Queen Isabella Lodge, No. 54, of the Independent Order of Good Samaritans and Daughters of Samaria. The lodge was organized on 27 September, 1879, under a charter of the Right Worshipful Grand Lodge, No. 10, of North Carolina.

As indicated by the name, the lodge was named after the patroness of Columbus and the Samaritan who was a neighbor unto him who fell among thieves on the way from Jerusalem to Jerico.

The members of the lodge were of the colored race, and the purposes were to take care of the sick and provide for the burial of their members and for other worthy and charitable acts. In the beginning, the organization functioned and had a large membership and fulfilled the ideals of those after whom the lodge was named.

There was an insurance provision connected with the lodge, but this provision in the charter of the Right Worshipful Grand Lodge, No. 10, was revoked by the Insurance Commissioner of North Carolina about 1909. The local lodge then began to decline and cease to function as theretofore. A few of the members had the building rented out, kept in force the insurance on the building, paid the street assessments for paving, electric light bills, bills for repairs and paid the death benefits of certain members who it is contended were in good standing when they died. Practically all of this money came from the rental of the building. There is a surplus now on hand of about $138.00. There are no records of collection of dues from 1914 to 1925, according to the secretary, Julia D. Willis.

It is contended by defendants that in the year 1925, defendants Mary Howell and W. L. Barker (defendant M. F. Taborn refusing to join with them after suit was brought unless the whole lodge came in, according to her testimony) were members in good standing. The membership had dwindled to six; that the three defendants having been appointed trustees, a resolution of the members in good standing was passed to the effect that the property be sold and the lodge disband. That the proceeds of the sale be distributed to such parties as may be entitled, according to their respective rights. Upon the alleged trustees advertising this property for sale, plaintiffs brought this action to restrain and enjoin the defendants from selling the property.

The contest and trial in the court below was as to the standing of the respective parties in the lodge. The charter granted the lodge at Oxford by the Grand Lodge, on 27 September, 1879, divided the members into two classes—"financial" and "unfinancial." That certain monthly dues had to be paid by the members, and in the event of a member being suspended for nonpayment of monthly dues, the time allowed was three months to pay up or the membership would be forfeited and the name taken off the roll of the lodge; that the plaintiffs

were "unfinancial" and had forfeited their membership; that plaintiff Ed Smith had paid no dues since 1909, and Ed D. Tyler had paid nothing since 1913.

The plaintiffs, on the other hand, contend that they are "financial," and still members of the lodge; that the provisions in the 1879 charter were changed by constitution and by-laws of 1886, and a member of the lodge could not be suspended, expelled or dropped for the nonpayment of dues without written notice; that this superseded the constitution and by-laws of 1879; that the material provisions of the 1886 constitution and by-laws germane here are as follows: (1st) When the lodge suspends or expels a member, they shall send a written notice to the member informing him or her of the same. (2d) When a member is "unfinancial" the lodge shall notify him of the same and said member shall have one month to pay up square on the books, and if they fail to comply within that time the lodge shall have the right to suspend until their arrearages are paid in full. (3rd) No member shall be suspended from the order *for nonpayment of dues without first being notified in writing* of the indebtedness to the lodge and a majority of the members present voting for the same. The secretary shall send them written notice informing them of their suspension.

It is further contended by plaintiffs that they had no notice or written notice and that they were still "financial" members of the lodge; that the property was rented out and the lodge went down for lack of members and ceased to function temporarily. No meetings were legally held and no one authorized to whom dues could be paid if they were due, and that they were able, ready and willing to perform their duties as members.

This is the substance of the material contentions as we gather them from the record.

The issues submitted to the jury by the court below, and their answers thereto, were as follows:

"1. Were the plaintiffs, Ed D. Tyler and Ed Smith, or either of them, at the time of the institution of this action, members of Queen Isabella Lodge, No. 54, of the Independent Order of Good Samaritans and Daughters of Samaria? Answer: Yes.

2. Are the defendants without authority to sell the property described in the complaint? Answer: Yes."

The defendants earnestly contended that the court below erred in allowing plaintiffs to offer in evidence the booklet of 1886. If it is error, was it harmful, prejudicial or reversible?

It will be noticed that the main controversy was that under the charter of 1879 a member could become "unfinancial" without notice. Under the 1886 provision, written notice must be given. Around this

the contest was waged. Defendants say in their brief: "Plaintiffs' whole
case depended upon the provision in the booklet produced by them to
the effect that a' written notice had to be sent to a member before he was
dropped."

Ed D. Tyler, plaintiff: "Witness was handed a book and asked what
book it was. He stated it was the constitution and by-laws of the Good
Samaritans dated 1886. The plaintiff, after the same was identified,
introduced in evidence the constitution and by-laws of The Right Wor-
shipful Sovereign Grand Lodge, No. 10, and the Government of the
Subordinate Lodges, Independent Order of Good Samaritans and
Daughters of Samaria adopted at the fourth session of the State Grand
Lodge, No. 10, at Charlotte, N. C., in the year 1886, and read there-
from and cited," among others, sections numbered for convenience 1,
2 and 3 before mentioned. This testimony was objected to and error
assigned. We think it was competent.

The plaintiff Tyler, on direct examination, testified: "That he could
not tell the date when the last regular meeting of the lodge was held,
*but it was eight or nine years ago, and that he was present at the last
meeting and was then in good standing, and has never received any
notice of a meeting since."* . . . "He was 'financial,' and never re-
ceived notice of suspension or expulsion." On redirect examination he
testified: "That he had received no notice that the lodge had been re-
vived—did not know it had been revived; Barker had always said he
could not get enough members to hold a meeting."

Ed Smith, plaintiff, testified in part: "Was a member of Queen Isa-
bella Lodge, No. 54. Don't know when last meeting of the lodge was
held; think I attended the last meeting in the lodge room. I was then
'financial' with the lodge. Have received no notice that I was 'unfinan-
cial' with the lodge, nor any written notice that I had been suspended
or expelled for nonpayment of dues." On cross-examination by defend-
ants, Smith testified, without objection: *"Witness stated that there was
a time limit in which a member must pay his dues, and it might have
been thirty or sixty days, and then they were suspended, but were not
suspended or expelled or dropped until they got a written notice;* that
was the rule of the lodge."

Bacon, Benefit Societies and Life Insurance (3 ed.), latter part
section 79, says: "It has been said that the constitution and by-laws
purporting to be published by the Supreme Council of the order and
furnished the local lodge and used by it are admissible in evidence
without further proof of their adoption." *Home Circle Society v.
Shelton,* 81 S. W., p. 84 (Texas).

We think the evidence made a prima facie case that the constitution
and by-laws had been adopted. They were printed, purported to be

used and were used by the lodge. But, even if admitted erroneously, such error was harmless. The defendants, without objection and by their own cross-examination, brought out the fact that written notice was required to a member before they were suspended, expelled or dropped.

In *Cook v. Mebane,* 191 N. C., p. 7, it was held: "If it was error to exclude the specific questions asked, as contended by defendant, it can't complain. A general question was asked by defendant embodying substantially the specific questions and answered without objection." "The erroneous admission of evidence on direct examination is held not to be prejudicial when it appears that, on cross-examination, the witness was asked substantially the same question and gave substantially the same answer." *Hamilton v. Lumber Co.,* 160 N. C., 48; *Ledford v. Lumber Co.,* 183 N. C., 616; *Gentry v. Utilities Co.,* 185 N. C., 287; *Cook v. Mebane,* 191 N. C., 1; *Hanes v. Utilities Co., ibid.,* 13; *Willis v. New Bern, ibid.,* 514.

In *Carden v. Sons and Daughters of Liberty,* 179 N. C., at p. 401, it is said: "The by-laws required the notice of assessments to be sent members by the lodge officers. It must be shown that this requirement was complied with and the member did not lose her good standing unless this was done. If the failure to send such notice was the negligence of the local agent or financial secretary, such default did not fall upon the member, and while the amount which the jury found to be thus due ($2.50) still remained a debt to be discharged by the member, which the jury has allowed as a credit on the $300, it did not place her out of the position of being in good standing. *Doggett v. Golden Cross,* 126 N. C., 486; *Duffy v. Ins. Co.,* 142 N. C., 106; *Lyons v. Grand Lodge,* 172 N. C., 410."

C. S., 6536 is as follows: "Appointment of trustees to hold property. The lodges of Masons, Odd Fellows, Knights of Pythias, camps of Woodmen of the World, councils of the Junior Order of United American Mechanics, orders of the Elks, Young Men's Christian Associations, Young Women's Christian Associations, societies for the care of orphans and indigent children, societies for the rescue of fallen women, and any other benevolent or fraternal orders and societies, may appoint from time to time suitable persons trustees of their bodies and societies, in such manner as they deem proper, which trustees, and their successors, shall have power to receive, purchase, take, and hold property, real and personal, in trust for such society or body. The trustees shall have power, when instructed so to do by resolution adopted by the society or body which they represent, to mortgage or sell and convey in fee simple any real or personal property owned by the society or body; and the conveyances so made by the trustees shall be effective to pass the prop-

erty in fee simple to the purchaser or to the mortgagee or trustee for the purposes in such conveyance or mortgage expressed. If there shall be no trustee, then any real or personal property which could be held by such trustees shall vest in and be held by such charitable, benevolent, religious, or fraternal orders and societies, respectively, according to such intent. This shall not affect vested rights nor apply to suits pending on the ninth day of March, one thousand nine hundred and fifteen."

Under the above law it is provided how benevolent or fraternal orders and societies can acquire and dispose of property.

We think the issues are proper ones from the pleading and evidence. Although the record is voluminous and there are numerous assignments of error, we think, on the whole record, there is no prejudicial or reversible error. It was mainly a question of fact to be determined by the jury.

On the verdict the court rendered the following judgment: "It is therefore ordered, adjudged and decreed by the court, that the plaintiffs, Ed D. Tyler and Ed Smith, at the time of the institution of this action were members of Queen Isabella Lodge, No. 54, of the Independent Order of Good Samaritans and the Daughters of Samaria. It is further adjudged by the court that the defendants are without authority to sell the property described in the complaint. It is further ordered, adjudged and decreed by the court that the defendants be, and they are hereby restrained and enjoined from selling the property mentioned and described in the complaint in this action, under the authority alleged in answer; and they are further restrained and enjoined from in any way interfering with the said Ed D. Tyler and Ed Smith in the exercise of their full rights, as members of said lodge. It is further ordered that the defendants pay the cost of this action."

It was stated on the argument that this action had revived interest in the lodge. The hope—Phoenix like—will rise in youthful freshness from its own ashes and bring to life again this lodge—once so useful to the human among the colored race, and emulate the goodness of its namesake—a queen who made possible the discovery of this fair land—and also continue the ideals of the other namesake—the Samaritan—that our neighbor is the one who is down and needing help along life's broad highway. The jury's verdict and the judgment of the court below have saved this humble lodge from sale and division of the proceeds, perhaps never intended by the original Christian promoters of the colored race.

From a careful inspection of the record, briefs of counsel, and judge's charge, we can find

No error.